UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,              Case No.: 8:20-cv-2492

                v.

                                  Hon._____

DENNIS JALI, ARLEY RAY JOHNSON,
JOHN FRIMPONG, 1ST MILLION LLC,
SMART PARTNERS LLC, and ACCESS
TO ASSETS LLC,

                Defendants.

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND
OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), an

independent federal agency, alleges as follows:

**I.     INTRODUCTION**

1.     Beginning on or before August 30, 2017 and continuing through the present (the

"Relevant Period"), Dennis Jali ("Jali"), has orchestrated a Ponzi scheme that ultimately yielded

over $28 million in fraudulently solicited funds from over 1,000 individuals, entities, and groups

of individuals located in this District and throughout the United States (collectively,

"participants").  Jali, along with Arley Ray Johnson ("Johnson"), beginning in or before May

2018, and John Frimpong ("Frimpong"), beginning in or before March 2018, each acting

individually in concert with each other, and through and on behalf of, 1st Million LLC ("1st

Million"), Smart Partners LLC ("Smart Partners"), and Access to Assets LLC ("A2A")

(collectively, "Defendants"), have fraudulently solicited funds from members of the public to

participate in a commodity interest pool ("commodity pool") for trading foreign exchange ("forex") contracts and digital assets such as bitcoin ("1st Million Pool").

2.     In carrying out the fraudulent scheme, Defendants 1st Million, Smart Partners, and A2A have functioned as a common enterprise while engaging in the unlawful acts and practices alleged in this Complaint.

3.     Defendants did not register 1st Million, Smart Partners, or A2A as commodity pool operators ("CPOs") or Jali, Johnson, or Frimpong as Associated Persons ("APs") of a CPO.

4.     Defendants, including Jali, Johnson, and Frimpong, have fraudulently represented to participants and prospective participants, in sales pitches, emails and so-called secure contracts, that participant funds would be held in trust then returned to participants in their entirety at the end of the pool participation term (typically one year), and also used to trade forex and bitcoin through pooled trading accounts controlled by Jali.  The Defendants also made misrepresentations and omissions of material fact concerning their backgrounds, their trading experience, and the likelihood of profit and risk of loss of trading in the 1st Million Pool, even guaranteeing rates of return on trading of 30% per month.  Defendants have lied about their purported trading orally and in emails, text messages, and other documents, including fabricating trading data purporting to show profitable trades made for the 1st Million Pool.  Defendants have also lied, and continue to lie, about the reasons they cannot honor requests for the return of participants' funds at the end of the pool participation  term or pay promised returns.

5.     In contrast to their representations, Defendants have not held participants' funds in a trust or escrow account.  Defendants opened at least nine bank accounts in the name of 1st Million, Smart Partners, and/or A2A where they commingled 1st Million Pool funds with Defendants' own funds, and misappropriated funds that they used to purchase expensive cars,

fund personal travel, and pay for their living expenses; as well as for business expenses for 1st Million, Smart Partners, A2A, and other entities associated with Defendants.

6.      In aggregate, Defendants returned at least $18.5 million to pool participants in Ponzi-like payments made from other pool participants' funds in order to create an illusion of profitability.  To the extent Defendants used pool participants' funds to purchase or trade bitcoin or other digital assets, that activity did not result in profits as required to pay guaranteed returns to participants.  Rather, as in all Ponzi schemes, Defendant's payouts of supposed profits to some participants largely consisted of other participants' misappropriated funds.

7.      By virtue of this conduct, Defendants have engaged, are engaging, or are about to engage in fraudulent acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2018), and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2019), specifically Sections 4k(2), 4m(1), 4o(1), and 6(c)(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1), 9(1) (2018), and Regulations 5.3(a)(2)(1) and 180.1(a), 17 C.F.R. §§ 5.3(a)(2)(1), 180.1(a) (2019).

8.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a 1 (2018), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.    JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly

authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

10.     Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because 1st Million and A2A are incorporated in this District and, along with Smart Partners, have maintained their principle place of business in this District; Frimpong resides in this District; all Defendants have transacted business in this District; and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

**III.    THE PARTIES**

11.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Commission Regulations promulgated thereunder.

12.     Defendant **Dennis Jali** was born in 1984 and is a citizen of South Africa.  During the Relevant Period, Jali has owned, controlled, and operated as a common enterprise Smart Partners, 1st Million, and A2A.  When communicating with participants and prospective participants, Jali has often represented that he was the "Founder and Principal Owner," as well as the "President and CEO" of 1st Million and a "professional licensed Forex trader."  During most of the Relevant Period, Jali lived in Upper Marlboro, Maryland and Chevy Chase, Maryland, among other places.  Upon information and belief, Jali is currently in South Africa.  Jali has never been registered with the Commission in any capacity.

13.     Defendant **Arley Ray Johnson** was born in 1959 and, upon information and belief, currently resides in Bowie, Maryland.  Beginning in or before May 2018, Johnson became the Chief Operating Officer of 1st Million and was responsible for accepting participant funds and issuing so-called return payments, paying the lease for the Defendants' offices, and managing payroll, among other duties.  Johnson has never been registered with the Commission in any capacity.

14.     Defendant **John Frimpong**, a/k/a Dr. John Erasmus, was born in 1980 and, upon information and belief, currently resides in Upper Marlboro, Maryland.  When communicating with participants and prospective participants, Frimpong held himself out as the "VP Sales & Marketing/Licensed Trader" or the "Managing Partner/ Blockchain Analyst" at 1st Million, as well as a "seasoned IT professional."  Beginning in or before March 2018, Frimpong has created marketing materials for 1st Million, organized promotional events, and solicited participants for the 1st Million Pool.  Frimpong has never been registered with the Commission in any capacity.

15.     Defendant **1st Million LLC** a/k/a 1stMillionDollars, is an active Maryland entity formed on January 1, 2019.  In its Articles of Organization, 1st Million describes its business as "Financial Literacy combined with Latest Technology and advanced systems of creating wealth privately and publicly."  During the Relevant Period, 1st Million maintained its principal place of business in Upper Marlboro, Maryland.  1st Million has never been registered with the Commission in any capacity.

16.     Defendant **Smart Partners LLC** is an active Delaware entity formed on January 12, 2017.  During the Relevant Period, Smart Partners maintained its principal place of business in Upper Marlboro, Maryland.  Smart Partners has never been registered with the Commission in any capacity.

17.     Defendant **Access2Assets LLC** is an active Maryland entity formed on January 17, 2019.  During the Relevant Period, A2A maintained its principal place of business in Upper Marlboro, Maryland.  A2A has never been registered with the Commission in any capacity.

## IV.    STATUTORY BACKGROUND

18.     A "commodity pool" is defined in Section 1a(10) of the Act, 7 U.S.C. § 1a(10) (2018), in relevant part as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests" including any "(i) commodity for future delivery, security futures product, or swap…"

19.     A "commodity pool operator" or CPO is defined in Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2018), as any person "engaged in a business that is of the nature of a commodity pool, investment trust, syndicate or similar form of enterprise and who, in connection therewith, solicits, accepts, or receives from others, funds, securities or property . . . for the purpose of trading in commodity interests."  Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2019) defines a CPO for purposes of 17 C.F.R. part 5, as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP as defined in section 1a(18) of the Act, and that engages in retail forex transactions."

20.     An "Associated Person" or AP of a CPO is defined by Regulation 1.3, 17 C.F.R. 1.3 (2019), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged.

21.     An "Eligible Contract Participant" or ECP is defined in Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2018), in relevant part, as an individual acting for its own

account who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10,000,000, or $5,000,000 and who enters into the agreement, contract or transaction to manage the risk associated with an asset owned or a liability incurred, or reasonably likely to be owned or incurred, by the individual.

22.     Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii) (2018), provides that the Commission shall have jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause 2(c)(2)(C)(i).  7 U.S.C. § 2(c)(2)(C)(i), in relevant part, applies to any agreement, contract, or transaction in foreign currency that is offered to, or entered into with, a person that is not an ECP, unless the counterparty, or the person offering to the counterparty, of the person is one of the enumerated exceptions not applicable here.

23.     Section 4o(1)(A)-(B) of the Act, 7 U.S.C. § 6o(1)(A)-(B) (2018), makes it unlawful for any commodity pool operator or associated person of a commodity pool operator, "by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly" (A) "to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant" or (B) "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

24.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

25.     Regulation 5.3 (a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2019), makes it unlawful for any CPO engaged in retail forex transactions to act as a CPO without being so registered.

26.    Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018), makes it unlawful for any

person to be associated with a CPO as a partner, officer, employee, consultant, or agent (or any

person occupying a similar status or performing similar functions), in any capacity that involves

the: (i) solicitation of funds, securities, or property for participation in a commodity pool or

(ii) the supervision of any person or persons so engaged, unless such person is registered with the

CFTC as an AP of a CPO.

27.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), makes it unlawful for any

person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a
> contract of sale of any commodity in interstate commerce, or for future delivery
> on or subject to the rules of any registered entity, any manipulative or deceptive
> device or contrivance, in contravention of such rules and regulations as the
> Commission shall promulgate by not later than 1 year after [July 21, 2010, the
> date of enactment of the Dodd-Frank Wall Street Reform and Consumer
> Protection Act] . . . .

28.    Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any
> swap, or contract of sale of any commodity in interstate commerce, or contract for
> future delivery on or subject to the rules of any registered entity, to intentionally
> or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme,
>     or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material
>     fact or to omit to state a material fact necessary in order to make the
>     statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business,
>     which operates or would operate as a fraud or deceit upon any person . . . .

29.    A cryptocurrency or virtual currency is a type of digital asset defined here as a

digital representation of value that functions as a medium of exchange, a unit of account, and/or

a store of value, but does not have legal tender status in any jurisdiction. Bitcoin and other

8

virtual currencies are distinct from "real" or "fiat" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.  Bitcoin is a commodity.  Typically, forex trading involves buying and selling fiat currencies, currency pairs, or forwards and futures on currencies.

## V.    FACTS

### A.    1st Million, Smart Partners, and A2A, Acting as Common Enterprise, Operated the 1st Million Pool.

30.    Beginning on at least August 30, 2017, Jali, acting individually and through 1st Million, Smart Partners, and A2A, began soliciting participants to trade forex and digital assets, including bitcoin, with the 1st Million Pool.  Jali has done business on behalf of and in the name of 1st Million, Smart Partners, and A2A throughout the Relevant Period.  Jali has variously identified himself as a minister, pastor, or prophet.  He also falsely represented that he had seven to ten years of experience trading and a proven track record of positive returns, telling at least certain participants that he had achieved positive returns of over 1700%.

31.    Frimpong has done business on behalf of and in the name of 1st Million, Smart Partners, and A2A since at least March 2018.  Frimpong also has identified himself as a minister or pastor.

32.    Johnson has done business on behalf of and in the name of 1st Million, Smart Partners, and A2A since at least May 2018.  Johnson also has identified himself as a minister or pastor.

33.    Jali, Frimpong, and Johnson each pitched the 1st Million Pool as a means of obtaining financial freedom to support churches and charitable religious causes and their

communications with participants and prospective participants were often cloaked in religious parlance.

34.     Although 1st Million, Smart Partners, and A2A were incorporated as separate entities, in actuality there is and has been little to no distinction between their ownership and operations and they have functioned as a common enterprise throughout the Relevant Period.  1st Million, Smart Partners, and A2A are each owned and controlled by Jali.  They have common management and employees; share legal, human resources, and accounting services; and have collectively operated the 1st Million Pool.  Defendants have also commingled funds between accounts in the name of 1st Million, Smart Partners, and A2A, and 1st Million and Smart Partners shared an office for most of the Relevant Period.  Further, when communicating with participants and prospective participants, Defendants have represented that Smart Partners and A2A are sister or partner companies of 1st Million, and Defendants' marketing materials identify 1st Million as "a Smart Partners LLC Company."

35.     1st Million holds itself out as a "Private Forex/Crypto Trading Company" founded in 2015 by "Forex Traders with more than 7 [and at times 10] years of experience, Lawmakers, Bankers and IT Programmers" that "went public 4 years ago as a private registered trading company in the United States."  1st Million has claimed that it "offers services to Clients seeking to learn how to grow their money and change their lifestyle through Cryptocurrency assets" including "Secure Crypto Accounts" and "Trading Portfolios" for cryptocurrencies such as bitcoin and "Forex also known as foreign exchange FX or currency trading."

36.     Defendants have told participants and prospective participants that the 1st Million Pool trades forex and cryptocurrency such as bitcoin and, on occasion, may purchase bitcoin on behalf of pool participants.

**B.**          **Defendants Entered Into Written Agreements with Certain Pool Participants**

37.     In connection with their participation in the 1st Million Pool, at least certain participants executed a Corporate Fixed Secure Guarantee or Corporate Guarantee, which often included a corresponding Cryptocurrency Contract or Forex Trading Contract (collectively, the "Secure Contracts").  In the Secure Contracts, Defendants typically represent that, in exchange for the participant loaning funds to 1st Million for a period of one year, Smart Partners would guarantee 1st Million's "prompt, full and complete performance" of all duties including payment of monthly, quarterly, semi-annual or annual returns for their account.

38.     At least one participant executed a Foreign Exchange Management Agreement ("Forex Agreement") in connection with her participation in the pool.  Under that agreement, the participant agreed to open a forex trading account with 1st Million and authorize 1st Million to retain "sub-advisors" to place orders and "engage in speculative trading" in forex transactions on "cash, spot, or forward basis" "with any trading platform used by 1st Million Dollars in the name of and for the sole account and risk of the Customer."  The Forex Agreement states that Defendants will be compensated through a monthly management fee of 10% of the value of "assets under management."  It also requires the participant to acknowledge that "1st Million Dollars and the SubAdvisors may have a conflict of interest in rendering advice to Customer because the financial benefit from managing other participants['] accounts may be greater, which may provide an incentive to favor such other accounts."

39.     Other participants, including many who were solicited through face-to-face meetings and financial seminars, did not enter into signed contracts.  Some received emails or texts acknowledging their participation in the 1st Million Pool.  Others, especially those who contributed to the pool by delivering cash to Defendants' offices, received a handwritten receipt

11

for their deposit.  At least certain participants did not receive any written acknowledgement from Defendants, but rather participated through informal "handshake" agreements.

40.     The 1st Million Pool includes a number of groups of individuals who pooled their funds and participated in the name of a single individual or entity.  Upon information and belief, most, if not all, of those participants did not receive any written acknowledgement of their contribution from Defendants.

**C.      Defendants Made Fraudulent Representations to Pool Participants and Prospective Participants.**

41.     When soliciting participants and prospective participants for the 1st Million Pool, Defendants represent that participants' funds would be held in "trust" or "escrow" under a "corporate guarantee" and participants would receive the entirety of their initial contribution to the pool at the end of the pool participation term.  Defendants also represent that participant funds would also be used to trade forex and bitcoin, among other digital assets; that all trading would be done by licensed, experienced traders; and that participants would receive guaranteed annual, quarterly, or monthly returns, generated by Jali's trading.  Each of these representations is false.

42.     Defendants' promotional materials tout the 1st Million Pool as "one of the most safe and secure ways to grow your wealth" as it includes a "guarantee backed by a 12 month contract" and "funds are placed into a Trust Account which makes the client a beneficiary of 1st Million Dollars as long as they hold an account with our company" and therefore purportedly assures that "all beneficiaries will be paid out their initial Principal."

43.     When soliciting prospective participants, Frimpong routinely promotes the security offered by the trust account, and has falsely represented that participants "can't lose" as their returns are "guaranteed."

44.     While acting on behalf of the 1st Million Pool, Jali, Johnson, and Frimpong have each made false representations to participants and prospective participants regarding their training and expertise.  Jali holds himself out as a "licensed forex trader" with a "high success closing rate."  Frimpong has falsely represented to at least certain participants that he is a registered securities representative and advisor.  During a meeting between Jali, Frimpong, and a prospective participant at 1st Million's offices, Frimpong told the participant that he and Jali were both traders but Jali was "better."  Johnson has falsely represented to at least certain participants that Jali was a licensed trader who came from the New York Stock exchange; and has also claimed that all of the traders at 1st Million were experienced traders.

45.     In fact, none of the Defendants have or had a license to trade forex, nor were any of the Defendants registered in any capacity at any time during the Relevant Period.

46.     Defendants have fraudulently represented that 1st Million Pool would deliver consistent, positive returns.  Defendants' promotional materials claim that: "Because we are able to forecast and predict trends in Cryptocurrency and Forex, we guarantee our clients a 10% monthly payout on a minimum startup principal of $5,000.00."  In an A2A promotional video posted on the internet on or around August 17, 2018, Jali proclaims that he has generated returns of "400% in six weeks, all live trading in real markets" and that he is such a good "forex trader" that "my wife has never worked a day in her life."

47.     For at least 2018 and 2019, Defendants developed an annual "rate chart" to use when soliciting participants for the 1st Million Pool.  Jali, Johnson, and Frimpong adjusted the rates of return on an annual basis based on what they expected the market to do in the next year and instructed Defendants' agents and employees to use the rate chart when soliciting pool participants and drafting Secure Contracts and other agreements.

13

48.     The 2018 rate chart represents that with a minimum initial contribution of $5,000, a participant would receive a 10% monthly return, while a $20,000 contribution would receive a 12% monthly return.  The 2018 rate chart further provides for adjusted or added principal rates of between 13% and 30%, depending on the amount contributed.  For example, a $100,000 contribution would result in a 25% return, a $201,000 contribution in a 30% return, and a $301,000+ contribution would receive the "MAX" return.  The 2018 rate chart further authorizes a "referral" credit of ".5% added to principal rate."

49.     The "1st Million Dollars 2019 Rate Chart" provides for "monthly payout secure contracts" payments of 6% beginning with a $5,000 initial contribution, resulting in a monthly payout of $300 and annual payout of $3,600, and as high as 15% beginning with a $300,000 contribution, resulting in a monthly payout of $45,000 and annual payout of $540,000.  For "quarterly payout secured contracts," the 2019 chart authorizes a 9% return on a $5,000 initial contribution, resulting in a three month payout of $1,350 and annual payout of $5,400, and promises a 15% return beginning with a $200,000 contribution.  The 2019 rate chart also authorizes a "referral" credit of ".5% added to principal rate."

50.     Defendants have misrepresented that the returns participants could expect to receive, and did at times receive, were the result of successful trading.  For example, during an in person meeting Frimpong not only told one prospective participant that the rates of return were real, but then purported to demonstrate how bitcoin was traded–and falsely claimed that trading was how 1st Million made money.  When another participant challenged the accuracy of the projected returns, Johnson simply lied: first, by denying that the 1st Million Pool was a Ponzi scheme and then by stating that Defendants could guarantee participant payouts because they had a number of successful investment strategies.

14

51.     In addition to soliciting participants through individual face-to-face meetings, Defendants also hosted seminars, financial literacy summits, and related events to drum up additional 1st Million Pool participants.  Often, these events were recorded and excerpts were posted on online where they could be viewed by members of the public.

52.     During the Relevant Period, Defendants held 1st Million Pool events in Atlanta, Baltimore, Dallas, Houston, New York, and Tampa, among other places.  At various times, Jali, Johnson, and Frimpong attended and presented at these promotional events, which were typically held at a local hotel or church.  Often one of the presenters–Jali, Johnson, or Frimpong, or at times a 1st Million agent or consultant acting on their behalf–would introduce the 1st Million Pool, explain the investment strategy and then provide various promotional materials, including, upon information and belief, those identified in paragraphs 46 through 49, above.

53.     At an event held in this District during the spring of 2019, Johnson described 1st Million as an "asset building company" with the goal of improving people's lives by helping them understand how to use, grow, and keep money "under the auspices of God."

**D.      In Contrast to their Representations, Defendants Used Only a Small Portion of 1st Million Pool Funds to Trade**

54.      Defendants opened and maintained at least nine bank accounts that were used to receive, hold, and transfer participant funds, namely:

| Account Name | Account No. | Signatory | Date Opened | Date Closed |
|---|---|---|---|---|
| THE SMART PARTNERS LLC | x0529 | Jali | 2/15/2018 | 5/13/2019 |
| THE SMART PARTNERS LLC | x8684 | Jali, Johnson | 5/7/2018 | 5/14/2019 |
| THE SMART PARTNERS LLC | x3700 | Jali | 2/15/2018 | 4/25/2018 |
| 1st Million LLC | x5849 | Jali | 2/15/2019 | 5/31/2019 |
| ACCESS2ASSETS LLC | x5477 | Jali | 5/4/2018 | 5/20/2019 |
| THE SMART PARTNERS LLC | x7920 | Jali | 2/6/2017 | 5/30/2019 |
| THE SMART PARTNERS LLC | x4349 | Jali | 2/6/2017 | 9/26/2017 |
| 1st Million LLC | x1464 | Jali, Frimpong | 5/3/2019 | 5/31/2019 |
| Acess2Assets, LLC | x4625 | Jali | 5/20/2019 | 5/31/2019 |

(collectively, the "1MP Bank Accounts").

55.      During the Relevant Period, Defendants instructed pool participants to send their funds directly to the 1MP Bank Accounts or to bring cash directly to Defendants' office in Upper Marlboro, Maryland.  In aggregate, Defendants have received at least $28 million in pool participant funds through deposits into the 1MP Bank Accounts.  Upon information and belief, Defendants also received at least several hundred thousand dollars of pool participant funds through cash deposits.

56.      None of the approximately $28 million in participant funds received by Defendants was sent to a forex trading account in the name of 1st Million, Smart Partners, or

A2A and, upon information and belief, no 1st Million pool funds were used for forex trading. While Jali opened at least two trading accounts in his own name with U.S. based firms, those accounts were never traded.

57.     Between November 2017 and May 2019, Defendants transferred at least $15 million to over-the-counter digital assets trading services and other third-parties to purchase bitcoin. Jali subsequently transferred some of the bitcoin purchased with pool participant funds to digital asset wallets in his name that he controlled. Jali also lost an unspecified amount of funds trading bitcoin.

58.     Most participants did not receive periodic statements or other documents reflecting trading done on behalf of the 1st Million Pool. At certain times, Frimpong and/or Johnson would show participants trading statements that purported to show the amounts traded by 1st Million that month and corresponding profit margin. Defendants falsely represented that those statements were created from a trading platform and showed actual trading done on behalf of the pool.

59.     Further, at certain times during the Relevant Period, Jali demonstrated purported forex trading on computers at A2A's office for both participants and, at other times, Defendants' employees. Upon information and belief, Jali often used demo accounts to demonstrate the so-called trading.

### E.        Defendants Misappropriated Pool Participant Funds

60.     During the Relevant Period, Defendants received at least $28 million in pool participant funds. Defendants misappropriated at least $7 million of those funds and used them for personal and business expenses. Defendants used pool participants' funds to pay over $450,000 in employee payroll including payments to the Jali family nanny and Jali's personal driver, $50,000 for Jali's Porsche, $174,000 in airline travel and related expenses, $147,000 on

hotels, $93,000 on dining and food, $54,000 on retail purchases, and $23,000 on rent for Jali's

personal apartment and the Defendants' offices in Upper Marlboro, Maryland.

61.     In aggregate, Defendants returned at least $18.5 million to participants in the form

of Ponzi-type payments to create the illusion of profitability.  At the time these payments were

made, Defendants falsely represented they were returns on profitable trading of forex and/or

cryptocurrency.

62.     Typically, Defendants told pool participants that so-called returns could be

reinvested in the pool or paid out.  Upon information and belief, during at least certain portions

of the Relevant Period, Defendants promised higher returns for participants that elected to

reinvest.  Nevertheless, around 800 of the approximately 1,000 1st Million Pool participants

requested payouts.  To the extent made by Defendants, returns were paid out in cash or bitcoin.

**F.        Defendants' Continued Efforts to Hide Their Misappropriation**

63.     Defendants concealed their misappropriation of participant funds by making

Ponzi-type payments to pool participants.  However, beginning at least in or around late 2018, as

an increasing number of one-year Secure Contracts expired, Defendants began having difficulty

meeting participant demands for the return of their initial investment, as well as making

payments for guaranteed periodic returns.

64.     By March 2019, and in response to numerous complaints of bounced checks from

pool participants, Defendants began telling at least certain participants that they were

"experiencing difficulties" with their banks for "no specific reason" and therefore 1st Million

Pool funds had been placed on hold for 21 days.

65.     On or before May 17, 2019, Defendants' agents and employees had informed the

majority of 1st Million Pool participants that the 1st Million Pool had ceased trading.

Defendants scheduled a meeting for the following day to address "the dissolution of Smart

Partners, negotiation and settlement of all contracts and creation of new Private Placement Companies to address trading issues for all those that are interested."

66.     On Saturday, May 18, 2019, approximately 300 participants attended a meeting at a church in Hyattsville, Maryland.  Jali, Johnson, and Frimpong each presented at the meeting and informed participants that all returns would be reduced to 6%.  Defendants continued to fraudulently represent that pool participants' funds were secure and held in trust.  Around this same time, the Defendants devised a scheme to separate participants into smaller groups and provide "settlement payments" that they claimed would consist of the participant's principle plus unpaid monthly returns for the time period of March to May 2019.

67.     To conceal and perpetuate their fraud, Defendants have continued to falsely represent that 1st Million Pool had sufficient funds available to make so-called settlement payments, and that such payments would be forthcoming.  For example, in a text to pool participants in late May 2019 Jali claimed a "team of lawyers," were working with "banks" and "international institutions" to transfer funds to an attorney trust account for distribution. Similarly, in a July 16, 2019 email, Jali falsely claimed to "have had very progressive steps toward the clearing of the funds.  The international institutions working with us ha[ve] made a way for us to be closer to settlement dates than we were about a week ago.  Because we need the funds to actually be transferred over to the attorney's trust account we can't say a date; expecting it not to be longer than two weeks."

68.     To date, no settlement has occurred and the Defendants have not returned funds to the 1st Million Pool participants who requested their money back.

**G.     Jali was the Controlling Person of 1st Million, Smart Partners, and A2A**

69.     At all times, Jali was the controlling person of 1st Million, Smart Partners, and A2A.  Jali founded and organized each of the aforementioned entities and acted and their

principal and manager.  Jali was in charge of hiring employees, retaining legal counsel,

approving agreements, and opening bank accounts for 1st Million, Smart Partners, and A2A.  Jali

was the signatory on each of the 1M Bank Accounts and controlled at least certain bitcoin wallet

addresses used to transfer pool participant funds.  Jali acted in bad faith or knowingly induced,

directly or indirectly, the fraudulent acts of 1st Million, Smart Partners, and A2A.

## VI.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I

**Violations of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2018)**

**(Fraud by a CPO—Defendants 1st Million, Smart Partners, and A2A;
Fraud by an AP of a CPO—Defendants Jali, Johnson, and Frimpong)**

70.    The allegations set forth in the preceding paragraphs are re-alleged and

incorporated herein by reference.

71.    During the Relevant Period, 1st Million, Smart Partners, and A2A acted and

continue to act as CPOs, as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2018), by

soliciting, accepting, and receiving funds from the public while engaged in a business that is of

the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of

trading in commodity interests.

72.    During the Relevant Period, Jali has acted and continues to act as an AP of a CPO

by soliciting and accepting funds for a pooled investment vehicle, the 1st Million Pool, from

non-ECPs for the purposes of trading retail forex; beginning in or before March 2018, Frimpong

has acted and continues to act as an AP of CPO by soliciting and accepting funds for a pooled

investment vehicle, the 1st Million Pool, from non-ECPs for the purposes of trading retail forex;

and beginning in or before May 2018, Johnson has acted and continues to act as an AP of CPO

by soliciting and accepting funds for a pooled investment vehicle, the 1st Million Pool, from non-ECPs for the purposes of trading retail forex.

73.     7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the CFTC or not, while using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from:  (A) employing devices, schemes or artifices to defraud any actual or prospective participant, or (B) engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any actual or prospective participant.

74.     As alleged herein, Defendants employed and are employing a device, scheme, or artifice to defraud actual and prospective participants or engaged or are engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon any actual or prospective participant, including without limitation by:  (1) misappropriating participants' funds and (2) making untrue or misleading statements of material fact about Defendants' trading expertise, track record, profitability, as well as the location and use of pool participant funds; and failing to disclose, or omitting, that Defendant was not using participants' funds as promised but rather using their funds to pay other participants, all in violation of 7 U.S.C. § 6*o*(1)(A)-(B).

75.     Defendants willfully, intentionally or recklessly engaged in the acts and practices described above.

76.     Each act of misappropriation and misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

77.     The foregoing acts, omissions, and failures by Jali, Johnson, and Frimpong occurred within the scope of their employment, agency, or office with 1st Million, Smart Partners, and A2A.  Therefore, 1st Million, Smart Partners, and A2A are liable for Jali, Johnson,

and Frimpong's violations of 7 U.S.C. § 6*o*(1)(A)-(B) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

78.     Jali held and exercised direct and indirect control over 1st Million, Smart Partners, and A2A and either did not act in good faith or knowingly induced their violations of 7 U.S.C. § 6*o*(1)(A)-(B).  As a controlling person of 1st Million, Smart Partners, and A2A, Jali is liable for 1st Million, Smart Partners, and A2A's violations of 7 U.S.C. § 6*o*(1)(A)-(B), pursuant to 7 U.S.C. § 13c(b).

## COUNT II

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018) and 17 C.F.R. § 180.1(a) (2019)**

**(Fraud by Deceptive Device or Contrivance)**

79.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

80.     During the Relevant Period, as described above, Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) in connection with contracts of sale of commodities in interstate commerce, or for future delivery, including without limitation digital assets such as bitcoin, by, among other things:  (1) misappropriating pool participant funds, and (2) making untrue or misleading statements of material fact about Defendants' trading expertise, track record, profitability, as well as the location and use of pool participant funds; and failing to disclose, or omitting, that Defendant was not using participants' funds as promised but rather using their funds to pay other participants.

81.     Defendants willfully, intentionally or recklessly engaged in the acts and practices described above.

82.     Each act of misappropriation and misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

83.     The foregoing acts, omissions, and failures by Jali, Johnson, and Frimpong occurred within the scope of their employment, agency, or office with 1st Million, Smart Partners, and A2A.  Therefore, 1st Million, Smart Partners, and A2A are liable for Jali, Johnson, and Frimpong's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

84.     Jali held and exercised direct and indirect control over 1st Million, Smart Partners, and A2A and either did not act in good faith or knowingly induced their violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) during the Relevant Period.  As a controlling person of 1st Million, Smart Partners, and A2A, Jali is liable for 1st Million, Smart Partners, and A2A's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a), pursuant to 7 U.S.C. § 13c(b).

## COUNT III

**Violations of Section 4m(1) and 4k(2) of the Act, 7 U.S.C. §§ 6m(1), 6k(2) (2018) and Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2019)**

**(Failure to Register as a CPO–1st Million, Smart Partners, and A2A; Failure to Register as an AP of a CPO–Jali, Johnson, and Frimpong)**

85.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

86.     During the Relevant Period, 1st Million, Smart Partners, and A2A each acted as a CPO by soliciting and accepting funds for a pooled investment vehicle, namely the 1st Million Pool, from non-ECPs for the purpose of engaging in retail forex transactions.  By engaging in

these activities without having registered as CPOs, 1st Million, Smart Partners, and A2A violated 7 U.S.C. § 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

87.     Each use by 1st Million, Smart Partners, or A2A of the mails or any means or instrumentality of interstate commerce in connection with their business as a CPO without proper registration, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

88.     Jali held and exercised direct and indirect control over 1st Million, Smart Partners, and A2A and either did not act in good faith or knowingly induced, directly or indirectly, their violations of 7 U.S.C. § 6m(1) and 17 C.F.R. § 5.3(a)(2)(i) during the Relevant Period.  As a controlling person of 1st Million, Smart Partners, and A2A, Jali is liable for 1st Million, Smart Partners, and A2A's violations of 7 U.S.C. § 6m(1) and 17 C.F.R. § 5.3(a)(2)(i), pursuant to 7 U.S.C. § 13c(b).

89.     During the Relevant Period, Jali was associated with CPOs 1st Million, Smart Partners, and A2A as an officer or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the CFTC as an AP of the CPO, in violation of 7 U.S.C. § 6k(2).

90.     Beginning in or before March 2018, Frimpong was associated with CPOs 1st Million, Smart Partners, and A2A as an officer or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the CFTC as an AP of the CPO, in violation of 7 U.S.C. § 6k(2).

91.     Beginning in or before May 2018, Johnson was associated with CPOs 1st Million, Smart Partners, and A2A as an officer or agent in a capacity that involved the solicitation of

funds, securities, or property for participation in a commodity pool, while failing to register with the CFTC as an AP of the CPO, in violation of 7 U.S.C. § 6k(2).

92.     Each act soliciting funds for participation in the 1st Million Pool by Jali, Johnson, or Frimpong, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(2).

93.     The foregoing acts, omissions, and failures by Jali, Johnson, and Frimpong occurred within the scope of their employment, agency, or office with 1st Million, Smart Partners, and A2A.  Therefore, 1st Million, Smart Partners, and A2A are liable for Jali, Johnson, and Frimpong's violations of 7 U.S.C. § 6k(2) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.     Find that Defendants Dennis Jali, Arley Ray Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC violated Sections 4k(2), 4m(1), 4o(1), and 6(c)(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1), 9(1) (2018), and Regulations 5.3(a)(2)(i) and 180.1(a), 17 C.F.R. §§ 5.3(a)(2)(i), 180.1(a) (2019);

B.     Enter an order of permanent injunction enjoining Defendants Dennis Jali, Arley Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC, their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receives actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6k(2), 6m(1), 6o(1), and 9(1), and 17 C.F.R. §§ 5.3(a)(2)(i) and 180.1(a);

C.      Enter an order of permanent injunction prohibiting Defendants Dennis Jali, Arley Ray Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC and any of their affiliates, agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from directly or indirectly:

      ii.      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

      iii.      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for accounts held in the name of any Defendants or in which any Defendant has a direct or indirect interest;

      iv.      Having any commodity interests traded on their behalf;

      v.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

      vi.      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

      vii.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and/or

      viii.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38), registered, exempted from registration, or

required to be registered with the Commission except as provided for in

17 C.F.R. § 4.14(a)(9));

D.      Enter an order directing Defendants Dennis Jali, Arley Ray Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as  the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, real and personal property and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and the Regulations as described herein, including pre- and post-judgment interest;

E.      Enter an order requiring Defendants Dennis Jali, Arley Ray Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest;

F.      An order directing that Defendants Dennis Jali, Arley Ray Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least the beginning of the Relevant Period to the date of such accounting;

G.      Enter an order directing Defendants Dennis Jali, Arley Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC, to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), tit. VII, § 701, 129 Stat. 584. 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations, as described herein;

H.      Enter an order requiring Defendants Dennis Jali, Arley Johnson, John Frimpong, 1st Million LLC, Smart Partners LLC, and Access to Assets LLC., to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

I.      Enter an order providing such other and further relief as the Court deem necessary and appropriate under the circumstances.

Dated: August 28, 2020

Respectfully submitted,

/s/ Elizabeth N. Pendleton

Elizabeth N. Pendleton
Cristina Covarrubias
David Terrell

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
*ependleton@cftc.gov*
*ccovarrubias@cftc.gov*
*dterrell@cftc.gov*
