IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | * | |
| | * | |
| Plaintiff, | | |
| v. | * | Case No.: GJH-20-2492 |
| **DENNIS JALI, ARLEY RAY JOHNSON, JOHN FRIMPONG, 1ST MILLION LLC, SMART PARTNERS LLC, AND ACCESS TO ASSETS LLC,** | * | |
| | * | |
| Defendants. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

The Commodity Futures Trading Commission ("CFTC"), an independent federal agency, brought this civil action alleging that Defendants Dennis Jali, Arley Ray Johnson, and John Frimpong, acting individually in concert with each other, and through and on behalf of, Defendants 1st Million LLC, Smart Partners LLC, and Access to Assets LLC ("A2A"), operated a fraudulent commodity interest pool in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1–26 (2018), and the Commission Regulations, 17 C.F.R. pts. 1–190 (2019). ECF No. 1. Pending before the Court is the Application of the United States to Intervene and Stay Proceedings, ECF No. 16, CFTC's Motion to Extend Time for Service of Process as to Defendant Dennis Jali, ECF No. 21, and CFTC's Second Motion to Extend Time for Service of Process as to Defendant Dennis Jali, ECF No. 22. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, all three Motions are granted.

1

## I.     BACKGROUND

### A.     Factual Background

According to CFTC, Defendants have fraudulently solicited over $28 million from members of the public under the guise of those individuals becoming participants in a commodity interest pool (the "1st Million Pool") for trading foreign exchange contracts ("forex") and digital assets such as bitcoin. ECF No. 1 ¶¶ 1, 30. Defendants accomplished this fraudulent solicitation by pitching the 1st Million Pool as a means of obtaining financial freedom to support churches and charitable religious causes and by making misrepresentations regarding the nature, performance, and operation of the 1st Million Pool. *Id.* ¶¶ 4, 33, 41. Specifically, in their communications with 1st Million Pool participants and prospective participants—including in sales pitches, promotional materials, seminars, financial literacy summits, promotional events, emails, and "so-called secure contracts"—Defendants represented that (1) participant funds would be held in trust and then returned to participants in their entirety at the end of the pool participation term; (2) participant funds would be used to trade forex and bitcoin through pooled trading accounts; (3) all trading would be done by licensed, experienced traders; and (4) that participants would receive guaranteed returns generated by Defendants' trading. *Id.* ¶¶ 4, 30, 36–37, 41–46, 50–52. In contrast to these representations, Defendants did not hold participant funds in a trust or escrow account, but rather opened at least nine bank accounts where the funds were commingled with Defendants' personal funds. *Id.* ¶¶ 5, 54, 60. Defendants used at least $7 million of the commingled funds for personal and business expenses. *Id.* None of the approximately $28 million in participant funds that Defendants received were sent to a forex trading account in the name of 1st Million, Smart Partners, or A2A, and no 1st Million Pool funds were used for forex trading. *Id.* ¶ 56. To the extent Defendants used participant funds to

purchase or trade bitcoin or other digital assets at all,[1] that activity did not result in profits as required to pay guaranteed returns to participants. *Id.* ¶ 6. Rather, Defendants' payouts to participants largely consisted of other participants' misappropriated funds. *Id.* ¶¶ 6, 61, 63. Finally, none of the Defendants have or had a license to trade forex, nor were any of the Defendants registered in any capacity.[2] *Id.* ¶¶ 12–17, 45.

Defendants attempted to conceal their fraud and misappropriation of participant funds by making Ponzi-type payments to pool participants—*i.e.* paying some participants their supposed profits by using the misappropriated funds of other participants. *Id.* ¶ 6, 63. In late 2018, however, Defendants began having difficulty meeting participant demands for the return of their initial investments as well as making payments for guaranteed periodic returns. *Id.* ¶ 63. To hide this difficulty, in March 2019, Defendants began telling certain participants that they were "experiencing difficulties" with their bank. *Id.* ¶ 64. By May 17, 2019, Defendants had informed the majority of 1st Million Pool Participants that the 1st Million Pool had ceased trading. *Id.* ¶ 65. Since that time, Defendants have continued to misrepresent why Defendants cannot return participant funds to those participants who have requested their money back. *Id.* ¶¶ 4, 66, 67.

B.    **Initiation of the Instant Action and Service on Defendants**

CFTC initiated this action on August 28, 2020. ECF No. 1. CFTC served Smart Partners on September 2, 2020, ECF No. 11, 1st Million on September 21, 2020, ECF No. 12, A2A on September 21, 2020, ECF No. 13, Defendant Frimpong on October 16, 2020, ECF No. 17, and

---

[1] Between November 2017 and May 2019, Defendants transferred at least $15 million to over-the-counter digital assets trading services and other third parties to purchase bitcoin. ECF No. 1 ¶ 57. Defendant Jali then transferred some of the bitcoin purchased to digital wallet assets in his name. *Id.* Defendant Jali also lost an unspecified amount of funds trading bitcoin. *Id.*

[2] Significantly, none of the Defendants have or had registered as required by the Commodity Exchange Act—*i.e.*, the Defendant entities are not and were not registered as commodity pool operators and the individual Defendants are not and were not registered as associated persons. ECF No. 1 ¶ 3, 24–26.

Defendant Johnson on November 4, 2020, ECF No. 20. Service has not yet been completed for Defendant Jali, who fled the United States in May 2019, was arrested by South African authorities in August 2020, and is currently awaiting extradition to the United States. ECF No. 21 ¶¶ 4, 5. Consequently, CFTC filed a Motion to Extend Time for Service of Process as to Defendant Jali on November 24, 2020, ECF No. 21, and a Second Motion to Extend Time for Service of Process as to Defendant Jali on May 12, 2021, ECF No. 22.

### C. Parallel Criminal Proceedings

On July 27, 2020, the United States Attorney for the District of Maryland indicted Defendants Jali, Frimpong, and Johnson on federal charges of conspiracy, wire fraud, securities fraud, and money laundering. ECF No. 16 ¶ 1; ECF No. 21 ¶ 4. The criminal charges arise from the investment scheme and fraudulent conduct described above. ECF No. 16 ¶ 2; *see United States v. Jali et al.*, TDC-20-220, ECF No. 1 (D. Md. July 27, 2020) (Indictment). The Indictment was unsealed on August 28, 2020, ECF No. 21 ¶ 4, the same day CFTC brought this action, ECF No. 1. On October 6, 2020, the United States filed its unopposed Application to Intervene and Stay Proceedings, seeking to intervene in this action pursuant to Fed. R. Civ. P. 24(b), and requesting that the Court stay civil discovery pending the resolution of the parallel criminal case. ECF No. 16 at 1.[3] CFTC takes no position on the United States' Motion, *id.* at ¶ 11, and, Defendant Johnson has consented, *id.* ¶ 10.

## II. MOTION TO INTERVENE AND STAY PROCEEDINGS

### A. Intervention

The Court first must consider whether the United States may intervene in the instant civil action. Permissive intervention, which the United States argues is appropriate here, is governed

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

by Fed. R. Civ. P. 24(b). Rule 24(b) provides, in relevant part: "On timely motion, the court may permit anyone to intervene who: . . . (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Courts within the Fourth Circuit, including this Court, have allowed the United States to intervene in a civil action under Rule 24(b) to seek a stay of discovery where there is a parallel criminal proceeding that involves common questions of law or fact. *See S.E.C. v. Bennet et al.*, No. PX-17-2453, ECF No. 14 (D. Md. Jan. 8, 2018); *Chu et al. v. Great N. Ins. Co. et al.*, No. RWT-10-1422, ECF No. 30 (D. Md. May 17, 2011); *see also U.S. Tobacco Inc. v. Big S. Wholesale of Va., LLC*, No. 5:13-CV-527-F, 2014 WL 4923627, at *1 (E.D. Va. Sept. 30, 2014).

As a preliminary matter, the United States' Application to Intervene is timely. The United States filed its Motion at an early stage of litigation: none of the Defendants have answered CFTC's Complaint, the parties have not filed any dispositive motions, and discovery has not begun. Thus, the Court finds the United States' Motion to Intervene is timely such that the Court may consider whether the parallel criminal proceeding involves common questions of law or fact.

The parallel proceedings at issue here involve common questions of fact. First, the parallel criminal action and the instant action substantially overlap with respect to the underlying facts supporting each action. The criminal charges arise from the investment scheme that Defendant Jali, Frimpong, and Johnson operated between about August 2017 and May 2019 through which Defendants solicited $28 million in funds "under the fraudulent pretense of investing in forex and cryptocurrency markets." *United States v. Jali et al.*, TDC-20-220, ECF No. 1 ¶ 25 (D. Md. July 27, 2020). The instant civil action arises from the same scheme. ECF No. 1 ¶¶ 1, 30; *see supra* § I.A. The Indictment alleges that Defendants Jali, Frimpong, and

Johnson recruited participants by holding promotional events at upscale hotels and event spaces and by targeting investments from churchgoers. *United States v. Jali et al.*, TDC-20-220, ECF No. 1 ¶ 26(a), (b) (D. Md. July 27, 2020). CFTC's civil action alleges the same. ECF No. 1 ¶¶ 33, 52–53; *see supra* § I.A. Lastly, the Indictment alleges that Defendants represented to participants and prospective participants that (1) participant funds would be held in a trust account; (2) Defendants were fully licensed and qualified to pursue their investment activities; and (3) participant funds would be used to invest in forex and cryptocurrency markets, but, in actuality, Defendants used participant funds to pay earlier investors or diverted the funds for their personal use. *United States v. Jali et al.*, TDC-20-220, ECF No. 1 ¶ 26(c) (D. Md. July 27, 2020). Again, the Complaint in the instant action includes the same factual allegations. ECF No. 1 ¶¶ 4, 30, 36–37, 41–46, 50–52; *see supra* § I.A. Moreover, due to the overlap in factual allegations, the evidence in the two proceedings will also materially overlap—*i.e.*, the investment contracts and promotional materials used by Defendants will be critical to both cases as will Defendants' financial records. Finally, the two cases will likely share many of the same witnesses, including the participant-victims and the employees of Defendant entities. Thus, the Court finds the parallel criminal proceeding shares common questions of fact with the instant action, and the United States' intervention is appropriate.

  **B.** **Stay**

  The second issue the Court must consider is whether to stay discovery pending the resolution of the parallel criminal case. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 379 (4th Cir. 2013) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936))

(brackets in original). "Because of the frequency with which civil and regulatory laws overlap with criminal laws, American jurisprudence contemplates the possibility of simultaneous or virtually simultaneous parallel proceedings and the Constitution does not mandate the stay of civil proceedings in the face of criminal proceedings." *Id.* (quoting *Ashworth v. Albers Med. Inc.*, 229 F.R.D. 527, 530 (S.D.W. Va. 2005). However, "[f]ederal courts have deferred civil proceedings pending the completion of parallel criminal prosecutions when the interest of justice seemed to require such action, sometimes at the request of the prosecution." *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970) (collecting cases). The propriety of a stay is determined on a case-by-case basis.

The Court considers six factors in determining whether a stay is appropriate in the instant case. First, the Court notes that, as discussed above, *see supra* § II.A, the two proceedings are related and involve substantially similar issues. *See Ashworth*, 229 F.R.D. at 531 ("As a preliminary matter, the requirement of the existence of a nexus between the parallel proceedings sufficient to show that such proceedings are related and involve substantially similar issues is the threshold factor for a stay."). Second, the Court looks at the interests of CFTC and—recognizing CFTC does not oppose the United States' request for a stay, ECF No. 16 ¶ 11—finds CFTC will not be prejudiced by the delay the United States seeks here. *See Ashworth*, 229 F.R.D. at 530–31 (collecting cases that consider "the interest of the plaintiffs in proceeding expeditiously with [the] litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay" as a relevant factor in determining whether to grant a stay (brackets in original)). Third, the Court considers the interests of Defendants and finds they will also not be prejudiced by the requested delay. *See id.* (collecting cases that consider the defendants' interests when determining whether to grant a stay). Rather, a stay may serve Defendants' interests. *See id.* ("[T]he strongest case for

deferring civil proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case." (quoting *S.E.C. v. Dresser*, 628 F.2d 1368, 1375–76 (D.C. Cir. 1980))). Fourth, the Court analyzes its own interests and finds that "the resolution of the criminal case may later streamline discovery in the civil case." *Id.* at 530–32 (quoting *Bridgeport Harbour Place I, LLC v. Ganim*, 269 F. Supp. 2d 6, 9 (D. Conn. 2002) (collecting cases that list the "efficient use of judicial resources" as a factor in determining whether to grant a stay). Fifth, the Court looks at third party interests. *Id.* (collecting cases stating that "the interests of persons not parties to the civil litigation" are a relevant factor in determining whether to grant a stay). Here, one such third party, the United States, has moved to intervene. "The government ha[s] a discernible interest in intervening in order to prevent discovery in a civil case from being used to circumvent the more limited scope of discovery in [a related] criminal matter." *S.E.C. v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988); *see also S.E.C. v. Nicholas*, 569 F. Supp. 2d 1065, 1071–72 (C.D. Cal. 2008) (stating that a stay of a civil proceeding was appropriate to maintain the integrity of the criminal discovery mechanisms); ECF No. 16 ¶ 9 ("The Government believes that permitting the civil discovery process to move forward in this case will interfere with the integrity of the criminal process and possibly have an improper impact on the success of the criminal prosecution."). Finally, the Court considers the public interest and determines that, while the Maryland public undoubtedly has an interest in the resolution of CFTC's claims, that interest is not as great as the public interest in unraveling a scheme to fraudulently solicit

millions of dollars in funds from members of the unsuspecting public and punishing those responsible for that scheme. *Ashworth*, 229 F.R.D. at 530–32 (collecting cases that consider the public interest as relevant to whether to grant a stay). Based on these findings, the Court grants the United States' request for a stay.

### III.  MOTION TO EXTEND TIME FOR SERVICE OF PROCESS

Defendant Jali fled the United States in May 2019 before being arrested by South African authorities in August 2020. ECF No. 21 ¶ 4; ECF No. 22 ¶ 4; *see also Jali et al.*, TDC-20-220, ECF No. 1 ¶ 27(gg) (D. Md. July 27, 2020). Defendant Jali is currently in custody in South Africa awaiting extradition to the United States. ECF No. 21 ¶ 5; ECF No. 22 ¶ 8. CFTC has been unable to arrange for service of process upon Defendant Jali in South Africa despite diligent efforts. ECF No. 21 ¶ 5; ECF No. 22 ¶ 9. Specifically, CFTC asserts that, although South Africa is a signatory to the Hague Convention, the COVID-19 pandemic has created delays regarding service on incarcerated individuals. ECF No. 21 ¶ 5; ECF No. 22 ¶ 9. Moreover, CFTC has been unable to determine with specificity where Defendant Jali is incarcerated. ECF No. 21 ¶ 5; ECF No. 22 ¶ 9. Because of the difficulties CFTC has faced in serving Defendant Jali in South Africa and given that the United States is working to secure the appearance of Defendant Jali in the parallel criminal case, CFTC filed the instant Motion to Extend and Second Motion to Extend, requesting to serve Defendant Jali after his extradition. ECF No. 21; ECF No. 22.

Under Fed. R. Civ. P. 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). "[W]hat constitutes 'good cause' necessarily is determined on a case-by-case basis within the discretion of the

district court." *Scott v. Md. State Dep't of Labor*, 673 F. App'x 299, 306 (4th Cir. 2016). However, in determining whether good cause exists, courts have considered the following factors:

> 1) the delay in service was outside the plaintiff's control, 2) the defendant was evasive, 3) the plaintiff acted diligently or made reasonable efforts, 4) the plaintiff is *pro se* or *in forma pauperis*, 5) the defendant will be prejudiced, or 6) the plaintiff asked for an extension of time under Rule 6(b)(1)(A).

*Id.*

First, the Court notes that the 90-day time limit in Fed. R. Civ. P. 4(m) does not apply to serving an individual in a foreign country under Fed. R. Civ. P. 4(f), the type of service at issue here. Fed. R. Civ. P. 4(m). However, even if the 90-day limitation did apply, CFTC has shown good cause for their failure to serve Defendant Jali. Defendant Jali fled the United States to a foreign country, is now incarcerated in a foreign country during a global pandemic, and CFTC has made diligent efforts to complete service but has reasonably decided the best course of action is to wait for Defendant Jali's extradition to be complete. Thus, the Court grants CFTC's Motion to Extend Time and Second Motion to Extend Time.

## IV. CONCLUSION

For the foregoing reasons, the United States' Application to Intervene and Stay Proceedings, ECF No. 16, and the CFTC's Motions to Extend Time for Service of Process as to Defendant Jali, ECF No. 21, ECF No. 22, are granted. A separate Order shall issue.

Date: June   1, 2021                            /s/
                                                 GEORGE J. HAZEL
                                                 United States District Judge